IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 40078-6-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MURPHY ADMIRE, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

COONEY, J. — Murphy Admire was convicted of felony violation of a no contact order and resisting arrest at the conclusion of a jury trial. Mr. Admire appeals, arguing (1) the information was constitutionally defective as to the charge of violation of a no contact order; (2) the trial court erred by not sua sponte investigating whether a juror's purported learning disabilities should have disqualified her from serving; (3) the prosecutor engaged in multiple instances of prejudicial misconduct; and (4) he was sentenced under an inaccurate offender score.

We agree with Mr. Admire's first contention, reverse his conviction for felony violation of a no contact order, and remand for dismissal without prejudice. We conclude Mr. Admire's second claimed error is unpreserved and decline review of his third and fourth purported errors because his conviction is being reversed.

## BACKGROUND

On August 7, 2023, Mr. Admire was detained by Klickitat County Sheriff's Deputy Anthony Warren, who was responding to a 911 call from Brooklynn Miles. A domestic violence no contact order was in effect that prohibited Mr. Admire from contacting Ms. Miles. Ms. Miles stated that she and Mr. Admire were spending time together and began arguing about being unable to obtain fuel because the gas stations were closed. Ms. Miles felt scared because Mr. Admire did not want her walking to a nearby store, resulting in her call to 911.

Deputy Warren was advised that there had been some "altercation" and that the "male half" of the parties "had walked away from the scene to walk towards the store." Rep. of Proc. (RP) at 220. Deputy Warren responded to the area and found Mr. Admire walking alongside the road toward a nearby store and detained him. Deputy Warren and Deputy Tyrell Howard then traveled to where Mr. Admire's vehicle was parked and located Ms. Miles. Deputy Warren advised Mr. Admire that he was under arrest. Mr. Admire became physically resistive, pulling away from the deputies and "[p]ushing off

the vehicle, pushing up against Deputy Howard and [Deputy Warren]" as the deputies

attempted to transfer him from one vehicle to another for transport to jail.  RP at 231.

Mr. Admire was charged with felony violation of a no contact order and resisting

arrest.  In part, the information alleged:

> That the defendant Murphy Admire, in the County of Klickitat, State of
> Washington, on or about August 7, 2023, did commit the crime of
> Violation of Domestic Violence No Contact Order by having knowledge
> that the Benton County District Court has previously issued a no contact
> order, under RCW 10.99, and did violate the terms of said order by coming
> within coming within, or knowingly remaining within, a specified distance
> of a location, a protected party's person, or a protected party's vehicle . . . .

Clerk's Papers (CP) at 1.  The case proceeded to a jury trial.  Following opening

statements, and outside the presence of the jury, the court informed the parties of a

potential issue with a juror.  The court reported that it was notified by court security that

juror 5 "indicated that she has a learning disability and that she had not been able to

understand the questions that had been asked."  RP at 189. The State addressed the court:

> I don't know anything about what that—you know, the—the interaction she
> had. But she's of age. She's qualified to serve as a juror. I don't know if she
> didn't—she didn't tell us. There was nothing in her answers that would
> have caused me any concern. I know she wasn't a big talker, she was a little
> reticent, but she was able, you know, when we asked do you have anybody
> in law enforcement, she said she's got a brother that's a jail guard.
>
> I—I—there was—there was nothing that—that gave me any concerns about
> her. You know, she's young and so I have concerns about young jurors, just
> as a general rule. But nothing that—that she—there was no vibe that I got
> that—

RP at 190.  Juror 5's mother then addressed the court:

3

[JUROR 5's MOTHER]: I just wanted to let you know that she has one. When she was supposed—when she came in she was supposed to tell the person right away—

….

—that she had a learning disability. She forgot.

….

Apparently something about I asked her did they ask a question about having a mental deficit and she said well, they did mention something about a mental thing and I said did you say anything and she said no. So, I just wanted to come and let you guys know that she does have one so she doesn't get in trouble for not answering that question.

THE COURT: With regards to that, is she able to essentially listen to testimony and make observations? Or to the—to what extent does that learning disability impact her ability to kind of perceive things and take in information?

[JUROR 5's MOTHER]: She—she can understand things, yes.

….

The problem with her is her comprehension. So, when she hears something for it to go in and understand and then let it come out is the problem. It's that whole, you know, understanding and putting it towards something. She has—she gets SSI. She's considered disabled through the State.

….

So, I don't know. I mean, if she can do it, I don't know. That's just it. Sometimes she can do things. Sometimes she can't.

….

THE COURT: But she's able to listen to stuff, take that in. It's whether or not she can essentially regurgitate that back out in any way?

[JUROR 5's MOTHER]: Mmm hmm. [Affirmative]. Mmm hmm. [Affirmative].

4

....

> [JUROR 5's MOTHER]: So, she—you know, if I think she'll be able to do it, probably. But, you know, I just want you guys to know.
>
> [COURT]: She is receiving SSI. Do you know, is there anything—just other than a—just a generalized learning disability?
>
> [JUROR 5's MOTHER]: Learning, developmental—that's what they have her under.

RP at 192-94.

The prosecutor expressed concern about embarrassing juror 5 "by having her brought out and then removed" and suggested she be designated as the alternate juror. RP at 195. The court responded to the prosecutor's request:

> Well, I'm not comfortable just doing that if she's not able to serve. It's either randomly selecting—whether or not she should continue on the trial—the jury panel or not. If there's a stipulation between the parties to excuse her, I would consider that because we do have thirteen jurors. But otherwise I would essentially need to inquire whether or not she can serve and—

RP at 195. Defense counsel did not believe this constituted a disqualification of juror 5, stating, "Certainly it sounds as if she comprehended the—our inquiry and maybe didn't know how to respond." RP at 196. Defense counsel was "of the opinion we should go forward with the thirteen that we have" and would not agree to juror 5 serving as the alternate. RP at 197.

The trial court then confirmed that defense counsel did not want juror 5 brought in for further questioning:

THE COURT: So, I just wanted to make sure I brought it to the parties' attention and whether or not we needed to bring that juror in for any kind of individual inquiry as to whether or not they are capable of serving as a juror any further. [Defense Counsel], you have no objection?

[DEFENSE COUNSEL]: No, Your Honor.

THE COURT: Or you have no concerns and do not need to go ahead and have her individually *voir dired*?

[DEFENSE COUNSEL]: Correct.

RP at 197-98. The trial continued with juror 5 serving on the petit jury.

Mr. Admire testified that he had received a call on the day of his arrest from a "male friend" of Ms. Miles who had been trying to retrieve some of Ms. Miles' belongings from Mr. Admire. RP at 259. Mr. Admire claimed he had not been with Ms. Miles that day, and he believed she was incarcerated at the time of the incident.

The jury found Mr. Admire guilty of felony violation of a no contact order and resisting arrest. The jury also returned a special verdict finding Mr. Admire and Ms. Miles were members of the same family or household for purposes of the no contact order conviction. The court later sentenced Mr. Admire to 60 months of confinement on the violation of a no contact order conviction.

Mr. Admire timely appeals.

ANALYSIS

SUFFICIENCY OF THE INFORMATION

For the first time on appeal, Mr. Admire argues the information was constitutionally defective as to the felony violation of a no contact order charge because it lacked the essential element of knowledge. We agree.

The constitutional adequacy of an information is reviewed de novo. *State v. Goss*, 186 Wn.2d 372, 376, 378 P.3d 154 (2016). "If a charging document is challenged for the first time on review, however, it will be construed liberally and will be found sufficient if the necessary elements appear in any form, or by fair construction may be found, on the face of the document." *State v. McCarty*, 140 Wn.2d 420, 425, 998 P.2d 296 (2000).

Criminal defendants have a right under the state and federal constitutions to know the charges brought against them. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22. A defendant also has the right to "'be apprised of the nature and cause of the accusation against him.'" *State v. Pry*, 194 Wn.2d 745, 751, 452 P.3d 536 (2019) (quoting *State v. Gehrke*, 193 Wn.2d 1, 6, 434 P.3d 522 (2019)). An information must provide the essential elements of the charged crime. *Pry*, 194 Wn.2d at 751. "While the information need not restate the precise language of the essential elements of a crime, the information must do more than merely name the offense and list the elements—it must allege the particular facts supporting them." *Id.* at 752. The information is required to state both statutory and nonstatutory essential elements. *McCarty*, 140 Wn.2d at 425.

7

In construing the information liberally, a two-pronged test is applied: (1) whether "the necessary facts appear in any form, or by fair construction can they be found, in the charging document; and, if so, (2) [whether] the defendant can show that he was nonetheless actually prejudiced by the inartful language which caused a lack of notice." *State v. Kjorsvik*, 117 Wn.2d 93, 105-06, 812 P.2d 86 (1991). Under the first prong, we look solely to the face of the charging document. *Id.* at 106. "Words in a charging document are read as a whole, construed according to common sense, and include facts which are necessarily implied." *Id.* at 109. Where "the necessary elements are not found or fairly implied" then prejudice is assumed, the second prong does not need to be met, and the defendant is entitled to reversal. *State v. Briggs*, 18 Wn. App. 2d 544, 549, 492 P.3d 218 (2021); *Sullivan*, 196 Wn. App. at 323. Dismissal without prejudice is the proper remedy for a conviction predicated on a defective information. *State v. Simon*, 120 Wn.2d 196, 199, 840 P.2d 172 (1992).

Mr. Admire contends the information was constitutionally defective because it did not include the essential mens rea element—that he knowingly violated a provision of the no contact order. The State responds that the information was sufficient because, under a fair construction, the knowledge element appears in the information and Mr. Admire suffered no resulting prejudice.

The State charged Mr. Admire under RCW 7.105.450 with violating a no contact order issued under RCW 10.99.050. The order prohibited Mr. Admire from the "[w]illful

8

violation of a court order issued under this section." RCW 10.99.050(2)(a). Willfulness

is an element that is satisfied by acting "knowingly." RCW 9A.08.010(4). Thus, the

essential elements of violating a no contact order are (1) the existence of a valid no

contact order prohibiting contact by the defendant with the protected party; (2) the

defendant had knowledge of the no contact order; and (3) the defendant knowingly (or

willfully) violated the no contact order. *Briggs*, 18 Wn. App. 2d at 550.

Relying on *Briggs*, Mr. Admire urges this court to reverse his conviction. *Id.* at

548-49. In *Briggs*, the defendant, Mr. Briggs, asserted the information charging him with

violation of a no contact order was constitutionally defective because it did not include

the essential element that he knowingly or willfully violated the order. *Id.* at 550.

Rather, like the information before us, the information in *Briggs* alleged Mr. Briggs "did

violate the order" without averring a particular mens rea. *Id*. at 551 (emphasis omitted).

This court agreed and concluded the information was constitutionally defective because it

did not "reasonably apprise an accused of the essential elements of felony violation of [a

no contact order]." *Id.* In further similarity to *Briggs*, both the information in *Briggs* and

the information before us included the noun "knowledge" in relation to the restrained

person knowing they were subject to a no contact order.

Notwithstanding the parallels between the information in *Briggs* and the one

before us, here, the State further alleged Mr. Admire violated the terms of the no contact

order by "coming within" or "knowingly remaining within, a specified distance of a

location." CP at 1. This language, according to the State, supplies the necessary facts, by a fair construction of the information, to fairly imply the essential elements. We disagree with the State.

In *State v. Simon*, our Supreme Court reversed a conviction for first degree promoting prostitution because the knowledge element was omitted in the second clause of the information, elaborating,

> [The defendant] *did* knowingly advance and profit by compelling Bobbie J. Bartol by threat and force to engage in prostitution; and *did* advance and profit from the prostitution of Bobbie Bartol, a person who was less than 18 years old.

120 Wn.2d 196, 199, 840 P.2d 172 (1992). The court reasoned, "By simple rules of sentence structure and punctuation, the term 'knowingly,' as used in the information, does not refer to the second means of committing the crime." *Id.*

As a contrast to *Simon*, we found in *State v. Chambers* that the language of a challenged information sufficiently provided notice of the essential elements where the knowledge element proceeded the verb and the direct object followed the verb. 23 Wn. App. 2d 917, 926, 518 P.3d 649 (2022). There, we held the knowledge element could be fairly imputed where the information alleged the defendant "knowingly possessed visual or printed matter depicting a minor engaged in sexually explicit conduct." *Id.*

Here, even when liberally construed, the "knowingly" element cannot be imputed to violating the terms of the no contact order because "knowingly" does not precede the prohibited act—that Mr. Admire "did violate the terms of said order." CP at 1. Stated

otherwise, Mr. Admire could "knowingly remaining within, a specified distance of a location" without knowingly doing so in violation of the order.  CP at 1.

Under a liberal construction of the information, the necessary elements are neither found nor fairly implied.  Because the information fails the first prong of the *Kjorsvik* test, prejudice is presumed and we refrain from addressing whether Mr. Admire was actually prejudiced by the inartful language.  The information is constitutionally inadequate to apprise Mr. Admire of the nature and cause of the accusation against him.  We reverse the felony violation of a no contact order conviction and remand for dismissal without prejudice.

WHETHER THE COURT ERRED BY NOT QUESTIONING JUROR 5

Mr. Admire contends that the trial court erred by not investigating juror 5's learning disabilities and ability to serve.  The State responds that the issue is unpreserved and this court should decline to review.  We agree with the State.

The appellate court may refuse to review errors not raised in the trial court. RAP 2.5(a).  However, a party may raise a "manifest error affecting a constitutional right" for the first time on appeal.  RAP 2.5(a)(3).  "A manifest error is an error that is 'unmistakable, evident or indisputable.'"  *State v. Young*, 158 Wn. App. 707, 718, 243 P.3d 172 (2010) (quoting *State v. Lynn*, 67 Wn. App. 339, 345, 835 P.2d 251 (1992)).  To show the error is manifest, there must be actual prejudice to the defendant.  *State v. Walsh*, 143 Wn.2d 1, 8, 17 P.3d 591 (2001).  Actual prejudice requires a "'plausible

11

showing by the [appellant] that the asserted error had practical and identifiable consequences.'" *State v. Kirkman*, 159 Wn.2d 918, 935, 155 P.3d 125 (2007) (internal quotation marks omitted) (quoting *Lynn*, 67 Wn. App. at 345). "If the facts necessary to adjudicate the claimed error are not in the record on appeal, no actual prejudice is shown and the error is not manifest." *State v. McFarland*, 127 Wn.2d 322, 333, 899 P.2d 1251 (1995).

Here, the State concedes that the issue of alleged juror incompetence is of constitutional magnitude. We accept the State's concession, recognizing that criminal defendants have the constitutional right to a fair, unanimous, and impartial jury. U.S. CONST. amend. VI; WASH. CONST. art. I, §§ 21, 22.

We next address whether the alleged error is manifest. Notably, Mr. Admire does not claim that juror 5's presence on the jury resulted in actual prejudice. Rather, citing cases dealing with trial courts' failure to sua sponte address issues with jurors expressing actual bias, Mr. Admire contends the trial court's lack of inquiry deprived him of a fair and unanimous jury verdict. We disagree with Mr. Admire.

Here, the trial court heard from juror 5, juror 5's mother, the State, and defense counsel. After listening to and observing juror 5 during voir dire and juror 5's mother, neither juror 5's mother, the attorneys, nor the court had concerns with juror 5's competency to serve following voir dire. Instead, the concern expressed was over juror 5's failure to disclose her learning disability in open court during voir dire. This

omission does not rise to the level of an error that is unmistakable, evident, or indisputable. Mr. Admire has failed to establish prejudice under RAP 2.5(a)(3). Thus, we decline review of the unpreserved error.

PROSECUTORIAL MISCONDUCT AND OFFENDER SCORE CALCULATION

Lastly, Mr. Admire raises claims of purported prosecutorial misconduct directed toward the charge of felony violation of a no contact order. Because we reverse his conviction for violation of a no contact order on other grounds, we decline review of his claims of prosecutorial misconduct.[1] Mr. Admire further challenges the calculation of his offender score. Again, we decline review of this claimed error because we reverse Mr. Admire's felony violation of a no contact order conviction on other grounds and Mr. Admire fails to address how an alleged incorrect offender score impacts his 90-day misdemeanor resisting arrest sentence.

CONCLUSION

We reverse Mr. Admire's felony violation of a no contact order conviction and remand for dismissal without prejudice. We decline review of Mr. Admire's unpreserved error related to the trial court's failure to sua sponte investigate juror 5's learning disabilities. Lastly, we decline review of Mr. Admire's claims of prosecutorial

---

[1] Mr. Admire's claims of prosecutorial misconduct center on issues of domestic violence and prior no contact order convictions. He fails to present any argument as to how the alleged misconduct was so flagrant and ill intentioned that an instruction would not have cured any prejudice related to the remaining conviction of resisting arrest.

No. 40078-6-III
*State v. Admire*

misconduct and the challenge to his offender score calculation. We affirm Mr. Admire's resisting arrest conviction based on his failure to assert how his claim of prosecutorial misconduct or challenge to his offender score calculation affected the conviction.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Cooney, J.

WE CONCUR:

_____
Lawrence-Berrey, C.J.

_____
Staab, J.

14